Under the circumstances, I think it was incumbent upon the defendant to show that there was an advertiser ready and willing to take the space in the plaintiff's periodical for the balance of the term agreed upon. The periodical published by the plaintiff was a trade journal, necessarily having a circulation limited to a certain class of subscribers. The advertising related to special subjects, and to obtain any advertisers at all it was necessary to canvass for them. The plaintiff held a valid contract for a certain space at an agreed price, which it set apart and kept for the defendant's advertisement. If the defendant chose to repudiate its contract, as it did, in order to relieve itself from damages, it should have proved that there were other advertisers ready to take the space at the same price. Mere proof of the fact that the plaintiff refused to recognize the attempted cancellation by defendant of its contract, and assumed that the space belonged to the defendant, and made no effort to fill it with other advertisements, I do not think prevented the plaintiff from recovering. There being no proof that the damages were less than the contract price, the court properly directed a verdict for the plaintiff for the full amount, and the judgment should be affirmed.

---

(147 App. Div. 593.)

In re UNION BANK OF BROOKLYN.

(Supreme Court, Appellate Division, Second Department. December 8, 1911.)

1. BANKS AND BANKING (§ 17*)—SUPERINTENDENT OF BANKS—STATUS OF DELINQUENT BANK.

Where the Superintendent of Banks has taken possession of a bank, its property, and business, as provided in Banking Law (Consol. Laws 1909, c. 2) § 19, and its assets have not been finally distributed or its affairs liquidated, and it has not been judicially dissolved or its charter annulled, it is still a bank, although for the time being prohibited from transacting business.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 17.*]

2. BANKS AND BANKING (§ 17*)—AUTHORITY OF SUPERINTENDENT OF BANKS—ISSUANCE OF SUBPŒNA.

Banking Law (Consol. Laws 1909, c. 2) § 8, provides for the inspection of banks by the Superintendent of Banks and authorizes him to examine every bank, at least twice a year, and on every such examination to inquire as to its conditions and resources, mode of conducting and managing its affairs, the action of its directors, investment of its funds, and whether requirements of its charter and of law have been complied with, and such other matters as the superintendent may prescribe. It also authorizes the superintendent, in a like manner, to examine every such corporation, whenever in his judgment its condition is such as to render an examination of its affairs necessary. Section 19 provides that, upon taking possession of the property, the superintendent may do such acts as are necessary to conserve its business and shall proceed to liquidate its affairs. *Held*, that section 8 applies both to active and delinquent banks, and the superintendent is authorized to examine a bank whenever he deems it necessary and upon taking possession to issue a subpœna for the examination of its officers.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 17.*]

3. STATUTES (§ 224*)—CONSTRUCTION—PRIOR LEGISLATION.

Where the language of a statute construed as new legislation is clear, resort may not be had to prior legislation in order to construe such

statute, as prior acts may be construed to solve, but not to create ambiguity.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 300, 302; Dec. Dig. § 224.*]

4. BANKS AND BANKING (§ 17*)—SUPERINTENDENT OF BANKS—POWER TO EXAMINE BANK OFFICERS.

Where the Superintendent of Banks has taken possession of a bank and subpœnaed an officer of the bank to appear before him for examination, his authority to examine the officer must be limited to those matters upon which information will be of assistance to him in his official duties, beyond which the witness may decline to answer.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 21, 22; Dec. Dig. § 17.*]

5. BANKS AND BANKING (§ 17*)—SUPERINTENDENT OF BANKS—POWER TO ISSUE SUBPŒNA.

The Superintendent of Banks, after taking possession of a bank, may subpœna an officer of the bank to appear before the superintendent for examination, without disclosing his motive therefor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 21, 22; Dec. Dig. § 17.*]

6. CONSTITUTIONAL LAW (§ 255*)—DUE PROCESS OF LAW—DEPRIVATION OF LIBERTY.

Code Civ. Proc. § 855, provides that, if a person subpœnaed fails to attend, the person issuing the subpœna, if a judge of a court of record, or, if not a judge of such court, then any judge of such court, upon proof by affidavit of failure to attend, must issue a warrant to the sheriff of the county demanding him to bring the defaulting witness before the officer, person, or body, before whom his attendance was required. *Held,* that the statute does not authorize the commitment of the person subpœnaed to any place of confinement, nor any greater interference with his liberty than the temporary restraint necessary to compel his production before the person authorized to require his attendance, so that the statute was not unconstitutional as depriving a person of his liberty without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 744; Dec. Dig. § 255.*]

Woodward and Rich, JJ., dissenting.

Appeal from Special Term, Kings County.

In the matter of the examination of the Union Bank of Brooklyn. Reargument of appeal from an order denying a motion to vacate a warrant issued by a justice of the Supreme Court upon affidavits of failure of the president of the Union Bank to appear before the Superintendent of Banks in obedience to a subpœna. Order affirmed.

See, also, 132 N. Y. Supp. 905.

Argued before HIRSCHBERG, BURR, THOMAS, WOODWARD, and RICH, JJ.

Martin W. Littleton (Frank R. Greene and F. Sidney Williams, on the brief), for appellant.

Wilber W. Chambers, Deputy Atty. Gen., for respondent.

BURR, J. [1] On and prior to April 5, 1910, a corporation known as the "Union Bank of Brooklyn" was transacting business in that borough. It was a moneyed corporation and within the statutory definition of a "bank." Banking Law (Consolidated Laws, c. 2; Laws of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

1909, c. 10) § 2. Edward M. Grout was the president thereof. Upon that date the Superintendent of Banks took possession of its property and business, as provided in section 19 of the banking law. That he was authorized to and lawfully took possession of the same is not questioned. Since then it has transacted no business. Its assets have not yet been finally distributed or its affairs finally liquidated, nor has it been judicially dissolved or its charter annulled. It is still a bank (Lafayette Trust Co. v. Higginbotham, 136 App. Div. 747, 121 N. Y. Supp. 489), although for. the time being prohibited from transacting business as such. Following the nomenclature of the banking law, it may be termed a "delinquent bank." On July 17, 1911, the Superintendent of Banks began an examination into the condition and management of said bank, and on the 22d of August a subpœna was issued under his hand and seal, requiring Mr. Grout to appear on the 25th day of August and testify and give evidence upon such examination. Upon proof by affidavit of his failure to appear, on September 16th a justice of the Supreme Court of the state of New York issued a warrant to the sheriff of Kings county, requiring him to apprehend said Grout and bring him before the Superintendent of Banks on the 18th day of September at the hearing fixed for that day. Thereupon a motion was made upon notice to the Superintendent of Banks at a Special Term of the Supreme Court to vacate and set aside said warrant. From an order denying such motion, this appeal is taken.

[2] The first question presented is one of authority to issue the. subpœna. If no such authority exists, it follows that all proceedings to compel obedience to its provisions must fail. The banking law provides (section 8) as follows:

"Every corporation * * * specified in section two of this chapter shall be subject to the inspection and supervision of the superintendent of banks. He shall, either personally or by some competent person or persons to be appointed by him, to be known as examiners, visit and examine every bank * * * at least twice in each year. * * * On every such examination inquiry shall be made as to the condition and resources of the corporation, the mode of conducting and managing its affairs, the action of its directors, the investment of its funds, the safety and prudence of its management, the security afforded to those by whom its engagements are held, and whether the requirements of its charter and of law have been complied with in the administration of its affairs, and as to such other matters as the superintendent may prescribe. He shall have power in like manner to examine every corporation * * * specified in section two, whenever, in his judgment, its condition and management is such as to render an examination of its affairs necessary and expedient."

Appellant contends that section 8 applies only to banks which are still transacting business, and not to delinquent banks. Upon the argument of this appeal much discussion was had as to the meaning of the word "liquidate," and whether upon the facts disclosed by the motion papers it will be possible for the Union Bank to resume business. Such discussion seems to us wholly irrelevant. The section either limits the power of the superintendent to those banks of which he has not taken possession, as provided in section 19 of the banking law, or it applies to all banks, delinquent or otherwise, so long as they have legal existence. The statute makes no distinction in express

terms between active and delinquent corporations. It applies to them equally. Nor is the power of the superintendent to conduct an examination limited to active banks by necessary implication arising from the declared purpose for which examinations should be held. The statute first provides for examinations of banks, to be held at least twice a year. Upon "such examination" the general scope of the inquiry is indicated. We regard these words of the statute as suggestive rather than conclusive. But if we assume for the sake of the argument that they limit the scope of such inquiry to the matters specified in the statute, and that the words "as to such other matters as the superintendent may prescribe" under the rule of ejusdem generis are to be limited to subjects of a similar nature, and if we assume for the sake of the argument that these inquiries are from their nature more applicable to a "going" than a "delinquent" bank, still appellant's contention fails.

In addition to the examinations just referred to, the Superintendent of Banks "shall have power in like manner to examine every corporation * * * whenever, in his judgment, its condition and management is such as to render an examination of its affairs *necessary and expedient.*" This clause of the statute cannot be intended to give authority to conduct more frequent examinations of a similar character to those above referred to. The words "at least twice a year" simply fix the minimum number of such examinations. Beyond that, their number is always in the reasonable discretion of the superintendent. The words "in like manner" in the clause under consideration cannot, for the same reason, refer to those earlier provisions thereof indicating the scope of the examination. Thus construed, they would add nothing to the superintendent's previously existing power. These words must therefore refer to the method of conducting the examination, which shall be either personally or by some competent person appointed by the Superintendent of Banks. If, therefore, it is reasonably shown to be "necessary and expedient" to examine into the affairs of a bank, whether active or delinquent, in order to enable the Superintendent of Banks properly to discharge the duties devolved upon him by the statute, such examination is authorized. Referring again to section 19 of the banking law, we find that, in the case of a delinquent bank:

"Upon taking possession of the property and business of such corporation * * * the superintendent is authorized to collect moneys due to such corporation * * * and do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof as hereinafter provided. The superintendent shall collect all debts due and claims belonging to it, and upon the order of the supreme court may sell or compound all bad or doubtful debts, and on like order may sell all the real and personal property of such corporation * * * on such terms as the court may direct."

It is quite apparent that in such case it may be not only expedient, but necessary, for the superintendent to examine the officers of the bank, and perhaps other persons, in order to be able to reach a just conclusion as to the validity of apparent debts and claims due to the bank, the value of doubtful claims, whether it is wise to sell or compound the same, or to apply to the court for authority to do so, the

validity of claims against it, and with regard to many other matters in connection with the liquidation of its affairs, respecting which a mere inspection of the books of the bank might give meager and imperfect information.

[3] The appellant contends that the history of legislation respecting the power of the superintendent militates against this construction of the statute. The authority to liquidate the affairs of a delinquent bank was for the first time conferred upon the Superintendent of Banks by an amendment to section 19 of the banking law, which was adopted in 1908 (Laws of 1908, c. 143). At that time the provisions of section 8 of said act relative to examinations were substantially in the same form in which they now appear. General Laws (Laws of 1892, c. 689) § 37. But if the language of section 8 construed as new legislation is clear, resort may not be had to this rule of construction. Prior acts may be considered to solve, but not to create, ambiguity. Hamilton v. Rathbone, 175 U. S. 414, 20 Sup. Ct. 155, 44 L. Ed. 219. When the Legislature in 1908 by amendment of section 19 imposed new duties upon the Superintendent of Banks, in the proper performance of which examinations of its officers or other persons might be necessary and expedient, if the existing provisions of section 8 were clearly sufficient to authorize such examinations if the entire legislation had then been adopted for the first time, it does not follow that, because no amendment was then made to section 8, the scope of such section was not at that time extended to cover these new conditions. No amendment in this respect was made to section 8 at that time, because none was needed.

[4] In thus deciding, we wish to make it perfectly clear that we do not assume to pass upon the character of the questions which may be properly addressed to Mr. Grout, further than to say that of necessity they must be limited to those matters upon which information will be of assistance to the superintendent in performing the official duties devolved upon him. If attempt is made to extend the scope of the examination beyond this, the witness has perfect protection in declining to make answer, and would be justified in so doing. Nor are we at present concerned with the remedy available to the Superintendent of Banks, if the witness declined to answer any questions. Criticism is made upon the motive of said superintendent in instituting the examination, and in his method of conducting the same in public rather than in private. It is asserted that he has at least been lacking in courtesy in refusing Mr. Grout's request to examine the books and papers of the bank in his possession, that he might thus refresh his recollection respecting the subjects of the inquiry. The ethics of the situation belong to him.

[5] The statute seems to confer upon him the right to issue a subpœna to compel a witness' attendance without disclosing his motives. In this respect there is a difference between the power to issue a subpœna, and a subpœna duces tecum, as we have previously pointed out. In re Phillips, 143 App. Div. 522, 128 N. Y. Supp. 482. In the latter case it is essential to show that the case is a proper one. In re Foster, 139 App. Div. 769, 124 N. Y. Supp. 667. In the case

of an ordinary subpœna, there is ample power in the courts to protect a witness against an abuse of the authority conferred by the statute.

[6] It is further contended that, if the power to issue the subpœna exists, the act providing for the enforcement thereof (Code of Civil Procedure, § 855) is unconstitutional, for the reason that the statute does not require notice to be given to the person named in the warrant before the issuing thereof, and it results that he is thereby deprived of his liberty without due process of law (Const. art. 1, § 6). The section in question provides:

"A person who is duly subpœnaed, as prescribed in the last section, must obey the subpœna. * * * If he fails to attend the person issuing the subpœna, if he is a judge of a court of record or not of record, or if not, then any judge of such a court, upon proof by affidavit of the failure to attend, must issue a warrant to the sheriff of the county commanding him to apprehend the defaulting witness, and bring him before the officer, person, or body, before whom or which his attendance was required."

Under its provisions, no one assumes to finally determine the rights of the person subpœnaed, nor to provide punishment for his disobedience thereof. The statute does not authorize his commitment to any place of confinement, nor any further interference with his liberty than the temporary restraint necessary to compel his production before the person authorized to require his attendance. In this respect the section is clearly distinguishable from the succeeding section of the Code of Civil Procedure, construed in the case of Matter of Grout, 105 App. Div. 98, 93 N. Y. Supp. 711, relied upon by appellant. The right to issue such attachment as was here issued was asserted by this court in the case of Matter of Superintendent of Poor, 6 App. Div. 144, 39 N. Y. Supp. 878. In Matter of Searls, 155 N. Y. 333, 49 N. E. 938, the Court of Appeals, construing the provisions of a somewhat similar section of the Code (Code of Civil Procedure, § 915), intimate that there is power to enforce obedience to the subpœna by compelling attendance of the witness before the person named therein. It is true that in each of these cases the decision did not necessarily involve this question, but we think that the opinions clearly indicate the views of the judges thereon. The issuing of a summary attachment without notice to compel the attendance of a witness who has disobeyed a subpœna has long been exercised, and the right to do so seems not to have been questioned. There is a distinction between the temporary restraint necessary to bring a party before one authorized to conduct an examination, and the restraint which follows a final adjudication upon his rights. We think, therefore, that the statute authorized the issuing of this subpœna, and that the further provision authorizing the issuing of a warrant to compel the appearance of a witness duly subpœnaed before the officer issuing such subpœna is valid.

It follows, therefore, that the order appealed from must be affirmed on re-argument, with $10 costs and disbursements.

HIRSCHBERG, J., concurs. THOMAS, J., concurs in separate memorandum. WOODWARD, J., reads for reversal. RICH, J., concurs in result reached by WOODWARD, J.

THOMAS, J. The Superintendent of Banks has been in possession of the property and business of the Union Bank of Brooklyn since April 5, 1910. The present question is whether he is empowered to examine its president pursuant to a subpœna served upon him in August, 1911; that is; does the power to issue the subpœna survive the management of its concerns by the banker and accompany the possession, control, and disposition of its property by the superintendent? The bank is subject to the control and visitation of the state. The agencies and means of control, and the purposes thereof, are found in the banking law. Thereby the superintendent is charged with the execution of the laws relating to banks. Section 3. For this purpose there is delegated to him and his examiners the power to visit those to whom the banking privileges have been afforded. Visitation involves inspection and examination by the superintendent, aided, if there be need, by explanation by the banker, and from the knowledge so obtained the superintendent (Banking Law, § 8) subjects bankers and their business to his inspection and supervision. The section commands that the superintendent or his examiners shall visit every bank, trust company, and individual banker, at least twice in each year, savings banks at least once in two years, and other corporations under the law at least once in each year. What he shall do on such examination in the case of incorporated banks is then stated, and thereupon it is added that:

"He shall have power in like manner to examine every corporation and individual banker specified in section two, whenever, in his judgment, its condition and management is such as to render an examination of its affairs necessary and expedient."

The words "in like manner" refer to the sentence preceding it, where the trend and scope of the examination is indicated. It provides that:

"On every such examination inquiry shall be made as to the condition and resources of the corporation, the mode of conducting and managing its affairs, the action of its directors, the investment of its funds, the safety and prudence of its management, the security afforded to those by whom its engagements are held, and whether the requirements of its charter and of law have been complied with in the administration of its affairs, and as to such other matters as the superintendent may prescribe."

In aid of such examination the superintendent or his examiner is empowered "to administer an oath to any person whose testimony may be required * * * and to compel the appearance and attendance of any such person for the purpose of any such examination." What shall be done with the information required? An examiner shall report to the superintendent the result of such examination. Section 11. Then follow, among other things, statutory directions relating to the commencement of the business, specified duties and prohibitions laid upon the banker, and what steps shall or may be taken by the superintendent and others in case of the banker's default. Over the whole scheme is placed the supervisor. The state grants powers the exercise of which is encompassed with safeguards, intended to secure sound conduct of the business. Is the grantee furnishing the safeguards? · Is it using requisite methods?

Such matters fall under the superintendent's care. In case of violations he must demand amends. If they are not provided, or the business is beyond restoration, all of which he learns from his examinations, he may take over the management. The superintendent's supervision of the banker, as distinguished from the business itself, may coincide with the latter's management. But the examination of the undertaking does not cease. There is occasion to continue the examination for at least two purposes: (1) To gain a thorough and detailed knowledge of the affairs of the bank for the purposes of administering the assets; (2) to enable the superintendent, or other authority, to conclude whether the banker should be allowed to resume business, and this may involve inquiry as to the banker's and the directors' violations of laws.

Then the question arises whether the statute contemplates the procurement of evidence for such purposes or any of them. It is not enough that it appears in good reason that the evidence would be useful therefor. It must also appear that the statute intends to give him such aid. So the whole statute must be read in its letter and spirit with due consideration of the nature of the visitorial power. The object of visitation is, first-in time and importance, to determine whether the grantee of banking privileges is so duly using the grant as to make him worthy to continue such use, or whether his conduct is so illegal and injurious as to demand that amendment be made, either with or without the suspension of operation, or final withdrawal of the banking right, if such amendment be impracticable or impossible. The beneficiaries of such examination are the bank, its patrons, its creditors, stockholders, and the public. Section 8, empowering visits at least twice each year, does indeed contemplate that the banker doing business shall be visited. If he has ceased to do business because the superintendent has taken possession of the business, it is evident that the banker cannot be visited. Then the banker becomes a mere naked corporation, or an individual bereft for the time not only of his right to do business, but also of all property and facilities for doing it. One object of visitation has been attained, viz., knowledge of his default and unworthiness, and deprivation therefor of his privilege. The banker, whether a corporation or individual, lives on; but the franchise to engage in banking dependent upon the conditions prescribed by the statute has been taken away or suspended so far as the particular enterprise is concerned. The examination by this time has so far forth revealed the corporation's condition and resources, or the mode of conducting and managing its affairs, the action of its directors or the investment of its funds, the safety and prudence of its management, the security afforded by its engagements, or the compliance with its charter, as to demand that it be stripped of its management and property pending the administration of its estate.

If, then, the examination is solely to determine whether it shall be left in the management of its business, the power to examine ceases with such management. But it should be noticed that the superintendent is not compelled to make a complete examination in all the

particulars mentioned in section 8 before depriving, temporarily or permanently, the bank of its management of its business. By section 18, if from any examination or report the superintendent shall conclude that "such corporation is in an unsound or unsafe condition to transact the business for which it is organized, or that it is unsafe and inexpedient for it to continue business," and shall communicate the facts to the Attorney General, an action to dissolve such corporation may be maintained. But there is an alternative procedure, for by section 19, when it shall appear to the superintendent that the banker (1) has violated its charter or any law of the state, or (2) is conducting its business in an unsafe or unauthorized manner, or (3) if its capital is impaired, or (4) if the banker shall refuse to submit its books, papers, and concerns to the inspection of an examiner, or if any officer thereof shall refuse to be examined upon oath touching its concerns, or (5) if the banker shall suspend payment of its obligations, or (6) from any examination or report the superintendent shall have reason to conclude that the banker is in an unsound or unsafe condition, or that it is unsafe and inexpedient for it to continue business, or (7) if the banker shall neglect or refuse to observe an order of the superintendent specified in section 17, in any one of such instances the superintendent may take and retain possession of the property and business until such banker shall resume business, or its affairs be finally liquidated. There follow provisions for a resumption of business by the banker, either by the consent of the corporation or by virtue of an order of court ousting the superintendent; but the superintendent, if his possession continues, shall marshal the assets, ascertain the claims of creditors, pay the same, and distribute the surplus to the stockholders, or turn it over to a liquidator chosen by the stockholders.

Hence it appears that, in any one of seven conditions enumerated in section 19, the superintendent may assume the management for liquidation or restoration of control to the banker. But if the superintendent takes possession upon a single ascertainment, does his power or duty to examine as to the remaining matters cease? Assume, for instance, that the banker has neglected to observe a legal order of the superintendent, and consequently the superintendent takes possession. Shall not the superintendent in that case inquire as to the banker's condition and resources, as to its mode of conducting and managing its affairs, as to the action of the directors, as to the investment of its funds, as to the safety and prudence of its directors, and as to all matters relevant to the question of resumption of its business by the banker, or the liquidation of the business? Such examination for one purpose or another, or for all purposes, is necessary. If the examination is not made, then the requirements of section 8 are not met. Moreover, the superintendent could not make any rational administration of the affairs. Therefore in the very nature of the case the examination provided in section 8 should be made, and in some of the events, whereupon the superintendent's possession is permissible or demanded, must be made after his possession begins. Assume that the banker fails to make the report required by law, then the statute

(section 22) directs that the superintendent shall immediately cause the books, papers, and affairs of the banker "to be examined as directed by section eight"; but this is a violation of law that authorizes the superintendent to take possession under section 19, and it is not conceivable that such possession terminates the power to examine further under section 8. Assume that the banker suspends payment, and for that reason the superintendent takes possession. Does then the application of section 8 cease? A very vital exigency for its use is presented. The superintendent must take instant possession. But his power to examine is not vitiated. Examination is the primary condition of administrating the business. To deny this is to permit the banker by his fault or misfortune to escape examination and withhold aid in the administration of the business. The failure in such view would cripple the attempt to avert or modify its consequences. But examination of witnesses is associated with examination of the business and its past conduct. It is one means of examination provided by the statute. It coexists with such power of examination.

It may be that in the case at bar the banker will not ask to resume business. But that does not affect the abstract inquiry whether the power to examine the banker's affairs by means of witnesses exists. The question is: What power does the statute give? Does it cease with the banker's control? Is it defeated by the banker's misconduct whereby the state through its officer assumes control? Must the superintendent examine all witnesses before he takes control? Must he take control for any one reason at the peril of losing the benefit of all explanation by witnesses—those who have intimate knowledge of affairs? Must the superintendent determine whether he will permit resumption by the banker without the aid of the evidence of the banker and others as to the propriety of such resumption? The conditions compel a negative answer. It is the intention of the state that its examination may preclude failure and loss, will prevent unsound banking and illegal conduct; that, if by design or misfortune an impairment of the enterprise has come, it may be cured; that, if the enterprise has passed the limit of safe continuance, those concerned shall have just distribution of the property. But for any of these purposes examination is the essential upon which are based all subsequent actions, and it would leave the statute very imperfect if section 8, read in association with other sections, especially section 19, authorized no examination by the state after its assumption of the undertaking. I cannot attribute to the statute such deficiency, and thereby leave the superintendent disabled in the performance of his imposed duties.

I concur in the opinion of Mr. Justice BURR, and add the views here stated.

WOODWARD, J. (dissenting). On the 5th day of April, 1910, the State Superintendent of Banks, acting under the provisions of section 19 of the banking law (chapter 10, Laws of 1909), took possession of the property of the Union Bank of Brooklyn, and since that time its business has been suspended. There is no question here that the Union Bank was a bank under the definitions contained in the statute, nor is

there any question as to the legality of the action of the state superintendent in taking possession of the property, or of his conduct in reference to the liquidation of the corporation, which has extended to the point of disposing of some portion of the personal property of the corporation, abandoning some of its banking premises, and levying an assessment upon the stockholders of the corporation as a moneyed corporation. The controversy arises over an effort on the part of the present Superintendent of Banks, more than a year after the bank has ceased to transact business, to compel the president of the Union Bank, Edward M. Grout, to testify in a public investigation of the affairs of the bank, without an opportunity to examine the books and papers for the purpose of refreshing his memory as to details which it is obviously impossible to carry in mind. Mr. Grout at first agreed to submit to an examination for the purpose of giving aid in the solution of the questions arising upon the liquidation of the corporation; but when he subsequently learned of the public character of the investigation, and the disposition, as he claims, to make a spectacle rather than a legitimate inquiry into the affairs of the bank, he declined to appear. A subpœna was then served upon him, under the hand and seal of the Superintendent of Banks, and, upon Mr. Grout refusing to obey the subpœna, a warrant was issued in conformity with the provisions of section 855 of the Code of Civil Procedure, and these appeals bring up the question of the constitutionality of this section of the Code of Civil Procedure, and the authority of the Superintendent of Banks to compel Mr. Grout to testify under the provisions of section 8 of the banking law; one appeal being from a judge's order directing that a warrant issue to the sheriff of the county of Kings, commanding him to apprehend Mr. Grout and bring him before the Superintendent of Banks, and the other being from an order of the Special Term denying Mr. Grout's motion to vacate such warrant.

We will assume, without meaning to decide, that section 855 of the Code of Civil Procedure, as it relates to the present controversy, is not violative of any of Mr. Grout's constitutional rights. This brings us directly to the broad question presented by these appeals, whether the Superintendent of Banks, under the provisions of section 8 of the banking law, has the power to enter upon a public investigation of the affairs of the Union Bank more than one year after the property and business of such corporation has been reduced to possession by himself under the provisions of law, and to compel witnesses to undergo an examination limited only by the will or caprice of the Superintendent of Banks or his deputies, aided by special counsel. Before entering upon an analysis of the statute under which such a power is claimed, it is important to get in mind the constitutional power of the Legislature in respect to such an investigation, for it is always the duty of the court to construe statutes in such a manner as to bring them within the provisions of the Constitution, if this may be done by any reasonable interpretation of the language used, and it is always to be presumed that the Legislature has confined itself within the limits of its power. If we find that one construction of the power would violate the provisions of the Constitution, while another would obviate this

difficulty, it is our duty to choose the latter. It cannot be questioned that the power asserted by the Superintendent of Banks is judicial in character; that it is an attempt to enter into a judicial inquiry into the conduct of the corporation known as the Union Bank, which necessarily involves the action of its officers, for the very power to summon witnesses and to compel them to give evidence is a judicial function. How far may the Legislature confer upon a mere administrative official judicial powers?

In Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, Kilbourn had refused to answer certain questions put to him as a witness by the House of Representatives concerning the business of a real estate partnership of which he was a member, and to produce certain books and papers, and was by order of the House imprisoned for 45 days in the common jail. In an action against the sergeant at arms who enforced the order for false imprisonment, it was held that the House of Representatives had no general power to punish for contempt, and that its warrant could not be used as a shield for the sergeant at arms. In discussing the question arising upon the appeal in that case, the United States Supreme Court, after calling attention to the undoubted power of Congress to compel the attendance and testimony of witnesses in matters in which it was given judicial powers, as in trials of impeachment, etc., say:

"Whether the power of punishment in either House by fine and imprisonment goes beyond this or not, we are sure that no person can be punished for contumacy as a witness before either House, unless his testimony is required in a matter into which that house has jurisdiction to inquire, and we feel equally sure that neither of these bodies possesses the general power of making inquiry into the private affairs of the citizen. It is believed to be one of the chief merits of the American system of written constitutional law that all the powers intrusted to government, whether state or national, are divided into the three grand departments, the executive, the legislative, and the judicial; that the functions appropriate to each of these branches of government shall be vested in a separate body of public servants; and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other. * * * In the main, however, that instrument (the Constitution), the model on which are constructed the fundamental laws of the states, has blocked out with singular precision, and in bold lines, in its three primary articles, the allotment of power to the executive, the legislative, and the judicial departments of the government. It also remains true, as a general rule, that the powers confided by the Constitution to one of these departments cannot be exercised by another."

It is true, of course, that Congress is authorized to exercise only delegated powers, and it may be suggested that this discussion by the United States Supreme Court is not controlling; but we have authority in our own state, where the Court of Appeals, in sustaining a proceeding punishing for contempt, where a witness had refused to testify in a legislative investigation, the constitutionality of the power in the

Legislature to administer punishment for a contempt being before the court say:

"We ·are finally brought to the consideration of the important and more doubtful question whether the investigation which the committee was conducting was a legislative proceeding which the House was authorized to institute. This is a jurisdictional question, for the statute applies only to such proceedings, and, if the House had any authority independently of the statute, that must depend upon the question whether the testimony was sought for the purpose of aiding it in the performance of any of its constitutional functions. An investigation instituted for the mere sake of investigation,° or for political purposes, not connected with intended legislation, or with any of the other matters upon which the House could act, but merely intended to subject a party or body investigated to public animadversion, or to vindicate him or it from unjust aspersions, where the Legislature had no power to put him or it on trial for the supposed offenses, and no legislation was contemplated, but the proceeding must necessarily end with the investigation, would not, in our judgment, be a legislative proceeding, or give to either House jurisdiction to compel the attendance of witnesses or punish them for refusing to attend. * * * If the resolution had shown upon its face that the only purpose of the investigation was to satisfy the taxpayers of the state as to the truth of the charges, or to relieve the department of public works from reproach, and no farther action was contemplated or could be had in the matter by the Legislature, the case would fall within the decision in Kilbourn v. Thompson." People ex rel. McDonald v. Keeler, 99 N. Y. 463, 485, 2 N. E. 615, 626 (52 Am. Rep. 49).

If the Legislature cannot assume judicial functions, except as an incident to the discharge of its legislative powers, it would seem to follow that the Legislature cannot create an officer of the state and invest him with judicial powers beyond those which are necessary in the performance of the duties prescribed for him by law; it cannot empower him to intrude upon the legitimate domain of the courts, and authorize investigations of a general character, whatever may be its powers in equipping him with the powers necessary to the performance of his duties. I believe that it is a proper rule, within the authorities above cited, and those relied upon by the court in the discussions, that neither legislative bodies nor administrative officers can be invested with judicial functions beyond those expressly provided for by the Constitution, or to cases where the power is necessarily implied from those constitutional or statutory functions and duties to the proper performance of which it is essential. Burnham v. Morrissey, 14 Gray (Mass.) 226, 74 Am. Dec. 676. There is no power in the Legislature to provide for general investigations into the conduct of individuals. It may properly provide for investigation into the affairs of corporations of its own creation for the purpose of determining whether they are being conducted in accord with the letter and spirit of the law of their being, but it is quite another thing to carry on an inquisition after the corporation has been turned over to an officer of the state, and when there can be no question arising which is not within the jurisdiction of the Supreme Court.

I believe the banking law, properly construed, merely authorizes an investigation of a going concern, for the purpose of enabling the Superintendent of Banks to discharge the duties prescribed by statute, and that the proceeding now under consideration is an unauthorized

attempt to usurp powers belonging exclusively to the judicial depart-
ment of 'the state. Having in mind the proper limitations upon the
legislative power, let us examine the statute, giving consideration to
all parts of it, and determine, if we may, what the Legislature intended
to provide for in section 8 of the banking law. We will assume that
the statute, compiled and re-enacted in 1909, is to be construed as of
that date; that section 8 is to have the same force and effect as though
it had been enacted simultaneously with section 19 and other portions
of the statute. And, tried by this test, I am persuaded that the con-
tention of the appellant is sound.

Section 8 of the banking law, under which the Superintendent of
Banks claims the power to examine Mr. Grout upon the alleged falsity
of the reports made to the Banking Department during the time that
Mr. Grout was president of the Union Bank, provides that:

"Every corporation and individual banker specified in section two of this
chapter shall be subject to the inspection and supervision of the superin-
tendent of banks. He shall, either personally or by some competent person
or persons to be appointed by him, to be known as examiners, visit and ex-
amine every bank, trust company and individual banker at least twice in
each year," etc. "On every such examination inquiry shall be made as to the
condition and resources of the corporation, the mode of conducting and manag-
ing its affairs, the action of its directors, the investment of its funds, the
safety and prudence of its management, the security afforded to those by
whom its engagements are held, and whether the requirements of its charter
and of law have been complied with in the administration of its affairs, and
as to such other matters as the superintendent may prescribe. He shall have
power in like manner to examine every corporation and individual banker
specified in section two, whenever, in his judgment, its condition and manage-
ment is such as to render an examination of its affairs necessary and ex-
pedient."

Obviously the last clause above quoted can have no reference to a
bank which has been taken over by the Superintendent of Banks, for
it is only when, "in his judgment, its condition and management is such
as to render an examination of its affairs necessary and expedient,"
that he is authorized to act. Certainly there can be no question of
"condition and management" where the condition must have been
known before the Superintendent of Banks was authorized to take over
the property and business (section 19, Banking Law), and the manage-
ment, by any one other than the Superintendent of Banks or his depu-
ties, was suspended in the very act of taking possession. It is equally
clear that there could be no conjunction of necessity and expediency,
for the necessity of examining the bank must have been determined
before there could be any justification for the Superintendent of Banks
to take possession of the property, and, the examination having taken
place, there was an end of the necessity, and the question of expediency
was determined when the superintendent elected to take possession.
There can be no question about this proposition; it were idle to argue
it. The whole reading of the statute, so far as quoted, simply makes
it the duty of the Superintendent of Banks, or his appointees, to
make an examination of "every bank, trust company and individual
banker at least twice in each year," securing the specified information,
and to make examination of all of such corporations "whenever, in

his judgment, its condition and management is such as to render an examination of its affairs necessary and expedient," which clearly means that such examinations may be made oftener than the statute requires if the superintendent has reason to believe that this is necessary. In the case now under consideration it must be assumed that the Superintendent of Banks, or his deputies, made an examination of the Union Bank prior to the 5th day of April, 1910, on which date he took possession of the property and business of the corporation, and, as it is alleged and not disputed that this taking over of the bank was lawfully done, it must be presumed that this examination made it "appear to the superintendent" that this corporation had violated some of the conditions prescribed in section 19 of the banking law. This section provides that:

"Whenever it shall appear to the superintendent that any corporation or individual banker * * * had violated its charter or any law of the state, or is conducting its business in an unsafe or unauthorized manner, or if the capital of any such corporation or individual banker is impaired, or if any such corporation or individual banker shall refuse to submit its books, papers and concerns to the inspection of any examiner, or if any officer thereof shall refuse to be examined upon oath touching the concerns of any such corporation or individual banker, or if any such corporation or individual banker shall suspend payment of its obligations, or if from any examination or report provided for by this chapter the superintendent shall have reason to conclude that such corporation or individual banker is in an unsound or unsafe condition to transact the business for which it is organized, or that it is unsafe and inexpedient for it to continue business, or if any such corporation or individual banker shall neglect or refuse to observe an order of the superintendent specified in section seventeen of this chapter, the superintendent may forthwith take possession of the property and business of such corporation or individual banker, and retain such possession until such corporation or individual banker shall resume business, or its affairs be finally liquidated as herein provided."

Section 17 of the banking law, to which reference is made above, provides that:

Whenever the "superintendent shall have reason to believe that the capital stock of any corporation or individual banker * * * is reduced by impairment or otherwise below the amount required by law, or by its certificate or articles of association, he may require such corporation or individual banker to make good the deficiency within sixty days after the date of such requisition. He may examine or cause to be examined any such corporation to ascertain the amount of such impairment or reduction of capital, and whether the deficiency has been made good as required by him."

The matters which give the superintendent power to take possession of the "property and business of such corporation or individual banker," no distinction being made between them, are the matters which must necessarily be brought out by the examinations prescribed by section 8 of the banking law, and by those provided for in section 17 of the same act, and by bringing these sections together we get a comprehensive view of the scope and purposes of the statute. Section 17 deals entirely with an impairment of capital, such as is likely to happen without any culpable mismanagement, and it is provided that for such an impairment he "may require such corporation or individual banker to make good the deficiency within sixty days," and

to this end he is authorized to make an examination to determine the amount of this deficiency and whether the same has been made good as required by him. The mere impairment of capital is a sufficient justification for taking possession under one clause of section 19; but in those cases where the superintendent issues a 60-day order to make good the impairment, the neglect or refusal to observe the order is made a ground for taking possession of the property and business, and the superintendent is authorized to "retain such possession until such corporation or individual banker shall resume business, or its affairs be finally liquidated." While it is probably true that the superintendent may authorize a corporation or individual banker to resume business after correcting any of the abuses mentioned, the language of the law is such as to suggest that the leading object was to provide for the resumption of business upon complying with the order to be issued under the provisions of section 17, in the matter of impairment of capital. Be this as it may, it must be obvious that the purpose of the examinations provided for in sections 8 and 17 is to bring to the knowledge of the superintendent the facts which enable him to determine whether he will take possession of the property and business of a banking concern. When this result has been accomplished, and when a banking institution has been reduced to possession under the authority of section 19, the whole purpose of section 8 has been fulfilled in so far as the particular corporation or individual banker is concerned, and the power, in this respect, is at an end.

It is not pretended that the superintendent, or any of his deputies, have visited and examined the Union Bank twice in each year since the 5th day of April, 1910; they made their examination prior to this time and found the delinquencies which justified the taking over of the property and business of this bank, and from that moment the rights of the corporation and the duties of the superintendent are to be determined, not by section 8, but by those of section 19, and the provisions of section 8, giving power to the superintendent to administer oaths and to compel the attendance of "any such person for the purpose of any such examination," is merely a power to elicit testimony which shall aid the superintendent in determining whether a banking institution shall be taken into his possession, and has nothing to do with the duties required of him after the step has been taken and he enters into the possession of the property and business. These are fully provided for by section 19, and they require the sanction of the Supreme Court as to all matters of importance, because there are rights of property involved, presenting judicial questions which cannot be delegated to other than a judicial tribunal. In other words, if the superintendent should be permitted to examine Mr. Grout, and it should appear from such examination that the reports made to the Banking Department were false, or that any number of delinquencies existed during the time that Mr. Grout was president of the bank, it could make no possible difference in the duties of the superintendent as custodian of the property and business of the corporation; his powers would still be limited and defined by the stat-

ute.   In this connection it is important to note that one of the conditions authorizing the superintendent to take possession of the property and business of a banking institution is that "any officer thereof shall refuse to be examined upon oath touching the concerns of any such corporation or individual banker," and it can hardly be said that it is an intelligent reading of this provision to say that a provision which warrants the superintendent in taking possession of the property and business survives the act of taking such possession, and may be resorted to at any time for the purpose of enabling the superintendent, not to perform any duty prescribed for him by law, but to gratify some individual impulse.   Beyond this, section 18 of the banking law provides that:

"If the capital of any corporation to which this chapter is applicable shall be impaired, or if any such corporation shall refuse to submit its books, papers and concerns to the inspection of any examiner, or if any officer thereof shall refuse to be examined upon oath touching the concerns of such corporation, or if it shall violate its charter, or any law of the state, or if such corporation shall suspend payment of its obligations, or if such corporation shall conduct its business in an unsafe or unauthorized manner, or if from any examination or report provided for by this chapter the superintendent shall conclude that such corporation is in an unsound or unsafe condition to transact the business for which it is organized, or that it is unsafe and inexpedient for it to continue business, and the superintendent shall communicate the facts to the Attorney General, an action to procure a judgment dissolving such corporation may be maintained."

In like manner it is provided by section 22 of the banking law that:

In "case of the failure of any corporation or individual banker to make any report required by law, the superintendent shall immediately cause the books, papers and affairs of such corporation or banker to be examined as directed by section eight of this chapter."

And as section 21 of the banking law provides for a report at least every three months, and the Union Bank could not have made such a report with its property and business in the control of the officer to whom such report was to be made, it was the duty of the superintendent, under his present construction of the scope of section 8, to have instituted an examination when the Union Bank failed to make its first quarterly report, and quarterly thereafter; but no such action appears to have been taken.

It thus appears from every point of view that the sole purpose of the examinations provided for by section 8 of the banking law are to inform the Superintendent of Banks as to the condition of the several banking institutions at the time of such examination, and to enable him to determine whether he shall take possession of the property and business of any such banking institution "in anticipation of action by the Attorney General through the courts for its sale and distribution."   Matter of Murray Hill Bank, 153 N. Y. 199, 212, 47 N. E. 298, 301.   "The object of this unusual power," says the court in the case last above cited, "is to preserve the property for the purpose of administration under the banking law and the provisions of the Code.   The superintendent is made the statutory custodian until either the capital is restored by the voluntary action of the directors and stockholders, or proceedings in invitum are taken by the Attor-

ney General"; and it was held in this case that this custody of the superintendent could not be divested by means of a voluntary action for a dissolution of the corporation. Being designed for a particular purpose, to enable the superintendent to perform his duty in determining his action in reference to a banking institution doing business, section 8 of the banking law is now being resorted to, not for the purpose of guiding the superintendent in the discharge of his duties as custodian of the property and business of the Union Bank, for these duties are fully prescribed by section 19, but to conform to the individual conceptions of duty held by the person who happens for the time being to be the Superintendent of Banks. The suggestion is made, it is true, that the superintendent has not yet determined whether he will wind up the affairs of the Union Bank or permit it to continue in business, and that he desires this examination for the purpose of reaching this determination; but, whatever may be the superintendent's views upon this question, they have no justification in the law as we read it. Section 19 of the banking law, after making provision for the superintendent to take possession of a delinquent bank's property and business, and providing for giving notice to banks having dealings with it, provides that:

"Such corporation or individual banker may, with the consent of the superintendent, resume business upon such conditions as may be approved by him."

This is not a power in the superintendent to determine that a corporation shall resume business; it is merely a discretionary power vested in him to consent, upon such terms as he may prescribe, to a continuance of the business if the corporation or individual banker shall desire to do so. Being a discretionary power, the superintendent could, no doubt, impose any reasonable conditions in granting the privilege; but he is absolutely powerless unless the corporation or individual banker desires to avail of the privilege, and the contention that the present examination is necessary to enable the superintendent to determine whether he will grant a privilege which has not been asked for, and as to which he could impose his own conditions if it were desired, is without force or merit. It is entirely clear, from a reading of the provisions of section 19, that it was not intended that the superintendent should hold the property and business of the corporation or individual banker indefinitely for the purpose of determining what he would do. Such corporation or individual banker whose property and business has been taken over may, if it deems itself aggrieved thereby, any time within 10 days after such taking possession, "apply to the Supreme Court in the judicial district in which the principal office of such corporation or individual banker is located to enjoin further proceedings; and said court, after citing the superintendent to show cause why further proceedings should not be enjoined, and hearing the allegations and proofs of the parties and determining the facts may, upon the merits, dismiss such application or enjoin the superintendent from further proceedings, and direct him to surrender such business and property to such corporation or individual banker." This depends, of course, upon the ini-

tiative of the corporation or individual·banker, and, as no such step appears to have been taken in the present case, it must be assumed that the Union Bank did not feel itself aggrieved by the act of the superintendent in April, 1910, when he took possession of the same. After providing the discretionary power to permit a bank to resume business, and which probably depends largely upon the question of whether the capital has been restored by the voluntary action of the directors (Matter of Murray Hill Bank, supra, page 212 of 153 N. Y., page 298 of 47 N. E.), section 19 continues:

"Upon taking possession of the property and business of such corporation or individual banker the superintendent is authorized to collect moneys due to such corporation or individual banker, and do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof as hereinafter provided."

The command of the statute is not that he shall investigate individuals or corporations as *heretofore* provided, but that he "shall proceed to liquidate the affairs thereof as *hereinafter* provided." His duties, aside from the discretion vested in him to permit the resumption of business if the corporation or individual desire it, are controlled by the after provisions of the statute, not those which precede the power to take possession:

"Upon taking possession of the property and business of such corporation or individual banker the superintendent * * * shall proceed to liquidate the affairs thereof as hereinafter provided.. The superintendent shall collect all debts due and claims belonging to it, and upon the order of the supreme court may sell or compound all bad or doubtful debts, and on like order may sell all the real and personal property of such corporation or individual banker on such terms as the court shall direct; and may, if necessary to pay the debts of such corporation, enforce the individual liability of the stockholders. * * * If the superintendent doubts the justice and validity of any claim, he may reject the same, and serve notice of such rejection upon the claimant either by mail or personally. * * * An action upon a claim so rejected must be brought within six months after such service. * * * Upon taking possession of the property and assets of such corporation or individual banker the superintendent shall make an inventory of the assets of such corporation or individual banker in duplicate, one to be filed in the office of the superintendent, and one in the office of the clerk of the county in which the principal office of such corporation or individual banker was located," etc.

Throughout the length of section 19 there are provisions for dealing with the property and business of the corporation or individual banker, but in none of these are there any suggestions of a power to make further examinations of the officers of the bank, or of the individual banker; such examinations are not "hereinafter provided," and there are none of the duties prescribed which call for any such examinations, or where they would in any wise aid in the work which is pointed out. Full provision is made for dealing with bad debts and doubtful claims, full provision for the rejection of doubtful claims against the bank, with a short statute of limitations provided in which such claims may be asserted in the courts, and generally the affairs of the bank are left to be adjusted by the superintendent, subject to the direction of the Supreme Court, in much the same manner that a receiver would be authorized to close up the affairs of the bank. All

doubtful questions are left for the court to dispose of, or at least to supervise, and, as the court has ample powers to secure such evidence as may be necessary in disposing of any of the matters which are within its jurisdiction, no possible occasion can be suggested where the inquisitorial power asserted by the superintendent would be at all necessary in liquidating the affairs of the bank, and, as the constitutional power of the Legislature is limited to conferring judicial powers incidental and necessary to the discharge of legislative and executive functions, it would seem to follow that the true construction of section 8 is to limit its powers to those matters which arise prior to the taking over of the business and property of the corporation or individual banker, particularly as this is in accord with the exact language of the statute.

It is urged, as though of some importance, on the authority of Lafayette Trust Co. v. Higginbotham, 136 App. Div. 747, 121 N. Y. Supp. 489, that the Union Bank is still a bank; that it is still a corporation. The case cited is only authority for the proposition that an action on a promissory note, held by the bank, might be maintained by the bank, notwithstanding the possession of the property and business was in the Superintendent of Banks. The only question was as to who was the proper party plaintiff, and obviously the decision was right; but it has no bearing upon any question presented here. Assuming, however, that the corporation is continued, that the board of directors would have authority to do any and all acts which did not interfere with the possession of the property and business of the corporation, such, for example, as the taking of the necessary steps to make good the capital of the corporation, making reports, etc., there is still a dilemma for the construction contended for by the superintendent. Section 22 of the banking law provides that:

If "any corporation or individual banker shall fail to make two successive reports as herein required, every such corporation shall forfeit its charter, * * * and every such corporation * * * may be proceeded against and the affairs of such corporation closed, * * * in the same manner as an insolvent corporation or individual banker may be proceeded against. In case of the failure of any corporation or individual banker to make any report required by law, the superintendent shall *immediately* cause the books, papers and affairs of such corporation or banker to be examined as directed by section 8 of this chapter."

That is, if the corporation is still in existence as a responsible factor, it was its duty to make quarterly reports, as provided in section 21, and a failure to make two successive reports forfeited the charter of the corporation, and gave cause for the bringing of an action for the dissolution of the same, while the failure to make any one of these reports made it the duty of the superintendent to act immediately, and to cause an examination of the books, etc., as provided in section 8, and yet we find that while the property and business of this corporation was taken in charge by the superintendent on the 5th day of April, 1910, it was not until the 17th day of July, 1911, that the superintendent made any move toward an examination of the affairs of the Union Bank under the pretended authority of section 8. Under his theory the Union Bank, by failing to make two successive reports,

when it had no power to make them, has forfeited its charter, has laid itself liable to an action for dissolution; and yet he urges that he is still undecided whether he will permit this bank to resume business or not, although it does not appear that any individual or corporation has made any suggestion that it shall be resumed. While it is undoubtedly true that the corporation, once created, continues to exist for some purposes until it is dissolved according to law, yet when it is stripped, not alone of its property, but of its business—its management—by the sovereign power of the state, it unquestionably ceases to have that control over its action which would entail a forfeiture of its charter by reason of a failure to make reports. Being denied the power to make such reports by the state, it could not be bound to make them, and there could therefore be no obligation on the part of the superintendent to make an examination of the bank by reason of such failure, so that there can be found no justification for the present attempted examination under the provisions of section 22, and from the first to the last section of the banking law there is no authority for making an examination of the affairs of the Union Bank, or of its officers, after the bank has been taken into the custody and control of the superintendent. Such an examination involves the exercise of judicial powers—of powers belonging properly to the judicial department, the courts—of the state, and its delegation to an administrative officer can be justified only in so far as it is absolutely necessary in the performance of those duties which have been intrusted to him by the laws of the state. He has a perfect right to examine into the affairs of a bank for the purpose of determining any of the questions which he is bound to determine in deciding whether a bank shall be permitted to do business or not; he probably has a right to make any inquiry which shall be necessary to determine whether he will consent to a resumption of business at the request of a corporation as a matter of discretion; but, when he has once entered into the possession of the property and business of a corporation, his subsequent conduct is to be determined by the provisions "hereinafter provided," under the express language of the act, and there are no provisions for any further examinations, nor are there any conditions which might give rise to an implied power. The whole matter is governed by statute, and, when the statute prescribes what shall be done, it by necessary implication excludes anything further or different. Aultman & Taylor Co. v. Syme, 163 N. Y. 54, 67, 57 N. E. 168, 79 Am. St. Rep. 565.

Nothing which I have said in the above discussion is in conflict with Matter of Board of Aldermen, 68 Misc. Rep. 478, 124 N. Y. Supp. 70, for here the question is not as to the right or duty of a witness to testify in a lawful proceeding, but the validity of the proceeding itself is under consideration, and Mr. Grout is in some measure deprived of his liberty because he has refused to obey a subpœna for which there was no warrant in law.

This seems to me to be such a case as the Court of Appeals had in mind in its discussion in People ex rel. McDonald v. Keeler, 99 N. Y. 463, 485, 2 N. E. 615, 52 Am. Rep. 49, and as the proposed investigation could not be of any practical use in the performance of the duties

of the superintendent, as fixed and established by the law which gives him his only right to act in the premises, it cannot be presumed that the Legislature intended to invade the legitimate province of the courts in dealing with infractions of the law, by giving to a mere administrative official the power to conduct a general inquiry into the affairs of individuals. Suppose the investigation went on, and that it should appear that the reports under Mr. Grout's administration were false— even that Mr. Grout had been guilty of criminal complicity in such reports—how would that affect the superintendent in the discharge of his duties as custodian of the property of the bank? Under the banking law as it existed under the provisions of chapter 689 of the Laws of 1892, the superintendent was authorized by section 18:

"If any such corporation or individual banker shall refuse to submit its books, papers and concerns to the inspection of any examiner, * * * the superintendent may report the fact to the Attorney General, who shall institute such action or proceeding against such corporation or individual banker as is authorized in case of insolvent corporations."

There was no authority for the superintendent to take possession; he was simply authorized to make examinations under the provisions of section 8 of the banking law, which was identical with the same section as it now stands, and to report the results of such examinations, in a proper case, to the Attorney General, who proceeded as in the case of insolvent corporations. That is, he instituted actions or proceedings for the dissolution of such corporations, and receivers were appointed to take charge of the affairs of the bank, under the direction of the court. Would any one pretend that, under the banking law as it stood prior to 1908, there was any authority in the superintendent to examine into the affairs of a bank after a receiver had been appointed and taken possession of the same, upon his recommendation? If not, why should such a power be vested in the superintendent now? The only change in the law, in so far as it relates to the question here under discussion, is that under the provisions of section 19 (being a revision from the old section 18) the superintendent becomes in effect the receiver of the corporation, without the intervention of the Attorney General; his relation is changed from a supervising officer of a going concern to that of a receiver of an insolvent corporation, for the duties prescribed by the statute are those a receiver in their essential elements, and all of the important functions, as in the case of a receiver, are to be performed under the sanction of the court. There was no occasion for such an examination as is now proposed under the receivership; there is no more occasion for it under the statute as it now exists. If Mr. Grout has violated any law, either civil or criminal, the courts are open for the vindication of the law; the superintendent-receiver has nothing to do with these matters in performing the duties of such receivership as prescribed by the statute, however much he might desire, as a citizen, to expose and condemn them. These are matters which in the orderly course of events belong either to the public prosecutor or to those who have a direct pecuniary interest in the affairs of the bank, and we may safely leave them there, confining public officials to the duties which the law has prescribed for them, "avoiding in the exercise

of the powers of one department, to encroach upon another," to quote from Washington's Farewell Address, for, as he has so well said:

"The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism."

The orders appealed from should be reversed, and the appellant's motion to vacate the warrant should be granted.